1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RAMON ENRIQUEZ MENDEZ,                    No. 2:14-cv-1950-MCE-KJN (TEMP)

12                  Petitioner,

13          v.

14   STU SHERMAN, Warden,                       FINDINGS AND RECOMMENDATIONS

15                  Respondent.

16

17          Petitioner is a state prisoner, proceeding without counsel, with a petition for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction

19   entered against him on October 5, 2009, in the San Joaquin County Superior Court, on charges of

20   first degree murder, attempted robbery, and active participation in a criminal street gang.  He

21   seeks federal habeas relief on the following grounds:  (1) the trial court violated his Sixth

22   Amendment right to confront the witnesses against him and his Fourteenth Amendment right to

23   due process when it allowed the prosecution's gang expert to testify on the basis of hearsay; (2)

24   his sentence of life without parole constitutes cruel and unusual punishment, in violation of the

25   Eighth Amendment; (3) the evidence introduced at his trial is insufficient to support the robbery

26   special circumstance and his conviction for active participation in a criminal street gang; (4) his

27   trial counsel rendered ineffective assistance; and (5) jury instruction error violated his right to due

28   process.  Upon careful consideration of the record and the applicable law, the undersigned

                                             1

1    recommends that petitioner's application for habeas corpus relief be denied.

2    **I. Background**

3            In its unpublished memorandum and opinion affirming petitioner's judgment of

4    conviction on appeal, the California Court of Appeal for the Third Appellate District provided the

5    following factual summary:

6            Defendant was convicted by a jury of first degree murder
        (Pen.Code, § 187), attempted robbery (id. § 664/211), and active
7        participation in a criminal street gang (id. § 186.22, subd. (a)).
        (Further undesignated section references are to the Penal Code.)
8        The jury also found the murder was committed during the
        attempted robbery (§ 190.2, subd. (a)(17)(A)), both the murder and
9        the attempted robbery were committed for the benefit of a criminal
        street gang (§§ 186.22, subd. (b), 190.2, subd. (a)(22)) and a
10       principal in the offenses discharged a firearm causing great bodily
        injury (§ 12022.53, subds. (d) & (e)).
11

12           On the murder conviction, defendant was sentenced to life without
        the possibility of parole (LWOP) plus consecutive terms of 25 years
13       to life and 10 years for the firearm discharge and gang
        enhancements respectively.  On the attempted robbery, defendant
14       received a consecutive, one-third middle term of one year, plus
        enhancements of 25 years to life and 10 years for the firearm
15       discharge and gang enhancements, to run concurrently to the terms
        on the murder charge.  Finally, on the gang offense, defendant
16       received a concurrent middle term of two years.

17           Defendant appeals contending: (1) the trial court erred in denying
        his motion for mistrial after a prosecution gang expert presented
18       improper testimony; (2) he received ineffective assistance of
        counsel when his attorney elicited testimony from a witness
19       suggesting, incorrectly, that another witness had provided damaging
        testimony during the preliminary hearing; (3) there is insufficient
20       evidence to support the robbery special circumstance; (4) there is
        insufficient evidence to support the gang charge and enhancements;
21       (5) the jury was not properly instructed on the gang special
        circumstance; (6) the jury was not properly instructed on the
22       firearm enhancement; (7) the LWOP sentence constitutes cruel and
        unusual punishment; (8) the 10–year gang enhancements were
23       improperly imposed in addition to the 25–to–life firearm
        enhancements; and (9) the court was required to stay the sentences
24       on the attempted robbery and gang charges.

25           We agree with defendant that the gang special circumstance
        findings on the murder and attempted robbery offenses must be
26       reversed due to instructional error, the gang enhancements on those
        offenses must be stricken because they cannot be imposed in
27       addition to the firearm use enhancements, and the separate
        punishments for the robbery and gang charges must be stayed
28       pursuant to section 654.  In all other respects, we affirm the
        judgment.

1

## Facts and Proceedings

2
3
4

On the afternoon of December 9, 2007, defendant, Jose Cardenas, Martha M., and Carina G., along with several others, attended a gathering at the home of Jose P. in Stockton.  All of the attendees were members of the Surenos criminal street gang.  Defendant and Cardenas were members of the Vickystown subset of the Surenos, while Martha and Carina were members of the Playboys subset.

5
6
7
8

Cardenas, Martha M. and Carina G. arrived in a car driven by Carina, who parked in an alley behind Jose P.'s home.  Defendant arrived separately.  At some point during the afternoon, defendant and Cardenas stood among a group of men who were passing around a handgun.   Defendant had the gun in his pocket or waistband either before or after it was passed around.

9
10
11
12
13

Later in the afternoon, Cardenas, Martha and Carina got into Carina's car to leave and were waiting for defendant to join them.  About that time, 19–year–old Francisco Montejo walked passed [sic] them down the alley talking on a cell phone.  Cardenas made a comment to the effect that he liked the man's phone and should take it from him.  A couple of minutes later, Cardenas asked to be let out of the car and walked to the back of it.  Defendant joined him there and they talked for a couple of minutes.  The two then walked up the alley in the direction of Montejo.

14
15
16

Defendant and Cardenas approached Montejo and announced they were Surenos.  Cardenas held Montejo at gunpoint, while defendant attempted to search him.  However, before defendant could take anything, Cardenas shot Montejo in the chest.

17
18

Defendant and Cardenas fled and shortly thereafter were picked up by Carina G. and left the area.  Montejo later died from the bullet wound.

19
20
21

Defendant and Cardenas were charged with murder, attempted robbery and active participation in a criminal street gang, along with various special circumstances and enhancements, as described above.  They were tried together before separate juries.  Defendant was convicted as charged and sentenced as previously indicated.

22
23

People v. Mendez, No. C063386, 2013 WL 120935, at *1-2 (Cal. Ct. App. Jan. 10, 2013), as modified on denial of reh'g (Feb. 11, 2013).

24

## II.  Standards of Review Applicable to Habeas Corpus Claims

25
26
27
28

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502

3

1  U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

2         Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

3  corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

11        For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

12  holdings of the United States Supreme Court at the time of the last reasoned state court decision.

13  Greene v. Fisher, 132 S. Ct. 38, 44 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011)

14  (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "may be

15  persuasive in determining what law is clearly established and whether a state court applied that

16  law unreasonably."  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th

17  Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle

18  of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not

19  announced."  Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013) (citing Parker v. Matthews, 132

20  S. Ct. 2148, 2155 (2012)).  Nor may it be used to "determine whether a particular rule of law is so

21  widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court,

22  be accepted as correct.  Id.  Further, where courts of appeals have diverged in their treatment of

23  an issue, it cannot be said that there is "clearly established Federal law" governing that issue.

24  Carey v. Musladin, 549 U.S. 70, 77 (2006).

25        A state court decision is "contrary to" clearly established federal law if it applies a rule

26  contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

27  precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).

28  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

4

1    writ if the state court identifies the correct governing legal principle from the Supreme Court's

2    decisions, but unreasonably applies that principle to the facts of the prisoner's case.   Lockyer v.

3    Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002

4    (9th Cir. 2004).  A federal habeas court "may not issue the writ simply because that court

5    concludes in its independent judgment that the relevant state-court decision applied clearly

6    established federal law erroneously or incorrectly.  Rather, that application must also be

7    unreasonable." Williams, 529 U.S. at 412.  See also Schriro v. Landrigan, 550 U.S. 465, 473

8    (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent

9    review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

10   "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

11   'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v.

12   Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

13   Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner

14   must show that the state court's ruling on the claim being presented in federal court was so

15   lacking in justification that there was an error well understood and comprehended in existing law

16   beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

17        If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

18   court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v. Woodford,

19   527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008)

20   (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

21   2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering

22   de novo the constitutional issues raised.").

23        The court looks to the last reasoned state court decision as the basis for the state court

24   judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

25   If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

26   previous state court decision, this court may consider both decisions to ascertain the reasoning of

27   the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When a

28   federal claim has been presented to a state court and the state court has denied relief, it may be

5

1    presumed that the state court adjudicated the claim on the merits in the absence of any indication

2    or state-law procedural principles to the contrary." Richter, 562 U.S. at 99.  This presumption

3    may be overcome by a showing "there is reason to think some other explanation for the state

4    court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803

5    (1991)).  Similarly, when a state court decision on a petitioner's claims rejects some claims but

6    does not expressly address a federal claim, a federal habeas court must presume, subject to

7    rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 133 S. Ct.

8    1088, 1091 (2013).

9         Where the state court reaches a decision on the merits but provides no reasoning to

10   support its conclusion, a federal habeas court independently reviews the record to determine

11   whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v.

12   Thompson, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo

13   review of the constitutional issue, but rather, the only method by which we can determine whether

14   a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853.  Where no

15   reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

16   reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98.

17       A summary denial is presumed to be a denial on the merits of the petitioner's claims.

18   Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012).  While the federal court cannot analyze

19   just what the state court did when it issued a summary denial, the federal court must review the

20   state court record to determine whether there was any "reasonable basis for the state court to deny

21   relief." Richter, 562 U.S. at 98.  This court "must determine what arguments or theories . . . could

22   have supported, the state court's decision; and then it must ask whether it is possible fairminded

23   jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

24   decision of [the Supreme] Court." Richter, 562 U.S. at 102.  The petitioner bears "the burden to

25   demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v.

26   Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

27       When it is clear, however, that a state court has not reached the merits of a petitioner's

28   claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

6

habeas court must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

**III.  Petitioner's Claims**

      **A.  Testimony of Gang Expert**

      In his first ground for relief, petitioner claims that the trial court violated his Sixth Amendment right to confront the witnesses against him and his Fourteenth Amendment right to due process when it allowed the prosecution gang expert to testify on the basis of hearsay that Montejo's murder may have been committed for the benefit of the Sureno street gang.  (ECF No. 1 at 30.)[1]  Petitioner argues that the expert "disgorged testimonial hearsay to the jury," in violation of the Confrontation Clause.  (Id. at 34.)  He also argues the expert's testimony was so prejudicial as to render his trial fundamentally unfair, in violation of the Due Process Clause. (Id.)

      **1.  State Court Decision**

      The California Court of Appeal described petitioner's arguments and its ruling thereon, as follows:

> During cross-examination of the prosecution's gang expert, Officer James Ridenour, counsel for codefendant Cardenas asked how the offenses charged in this matter could have benefited the Surenos gang in light of the fact the defendants had not been wearing gang clothing, they did not flash gang signs, and no graffiti was produced proclaiming responsibility.  Ridenour answered: "Since this crime has happened, all the way up Cinco de Mayo, or actually it was May 3rd of this year, when I have talked to Norteno gang members, especially on May 3rd, I actually stopped and talked to them on the alley off Charter, okay, this alley that enters off MLK is actually a spot I stopped and talked to this kid.  We were just talking and I was asking him what was going on with his gang, what's going on with the fighting, has he been shot at lately, has he been - what's going on with him, the Nortenos, with the Nortenos and Surenos. We talked for a while, and I said—."
>
> At that point, counsel for defendant objected on hearsay grounds, and counsel for Cardenas objected that the answer was not responsive to the question.  The trial court overruled the objections.

---

[1]  Page number citations such as this one are to the page numbers reflected on the court's CM/ECF system and not to page numbers assigned by the parties.

Ridenour continued: "We talked for a while, and he said the Surenos are starting to step it up. I asked him what he meant by that." Counsel for Cardenas again objected, this time based on <u>Crawford v. Washington</u> (2004) 541 U.S. 36 [158 L.Ed.2d 177] (<u>Crawford</u>). The trial court again overruled the objection.

Ridenour then completed his answer: "And he said they are starting to step it up and that they have been killing a lot of us lately. I said, what are you talking about, and he said they killed their own people here in the alley a couple of years ago. During that same year, they were driving around in a truck just shooting Nortenos like they were nothing, and then they were talking about the homicide that happened at AM/PM, when they stabbed and shot the guy at AM/PM. He said they're just stepping up. They're not playing no more with us, they're trying to make a move. That's one way.

"I have also talked to citizens in that area, right after this homicide happened, a couple of months, and since then going through that area, asking them - I see people standing, mowing their yards and stuff like that, I just ask them what the neighborhood is like, they tell me they're tense, they're tense because of the shootings, they're tense because - and they say both Nortenos and Surenos, both Nortenos and Surenos seem like they are getting more violent, they're shooting people in the alley, they're shooting people in the streets."

At that point, counsel for defendant objected that the answer was not responsive and asked that it be stricken and to approach the bench. After an unreported bench conference, questioning moved on to other matters.

At the next break, counsel for defendant moved for a mistrial. Counsel indicated that, while the answer may have been responsive to the question, defendant "shouldn't be saddled with bad questions" asked by a co-defendant's counsel. Cardenas's counsel again asserted the testimony violated <u>Crawford</u>.

The trial court denied the motion. The court explained the question was legitimate and the answer was responsive, but "probably went too far." The court indicated the answer did not suggest that either defendant was involved in the other crimes described by the officer but instead the reference was to Sureno crimes in general.

Defendant contends admission of the foregoing testimony was so prejudicial as to render his trial fundamentally unfair, in violation of state and federal due process. He argues the trial court therefore erred in denying his motion for mistrial. Of course, implicit in this argument is that the trial court erred in overruling counsels' objections to the testimony in the first place. Defendant raises a number of separate arguments in this regard, including a claim that

admission of the evidence violated his constitutional right of confrontation as recognized in <u>Crawford</u>.

Inexplicably, the People respond only to this <u>Crawford</u>  argument,

thereby apparently conceding the others. However, we do not accept that implicit concession and shall consider each argument in turn.

Defendant first contends the court erroneously reasoned there was no prejudice from the foregoing testimony because it was not directed at him personally, but only at the Surenos gang generally. He points out: "The unidentified Norteno directly referred to the charged crimes ('they killed their own people here in the alley a couple of years ago'). Similarly, the neighbors' statements that they were tense because of the 'shootings' was solicited from those witnesses by Ridenour 'right after the homicide happened.'" Defendant argues the unidentified Norteno stated "they killed" rather than "they accidentally shot" the victim, thereby going to "one of the most hotly disputed issues in the trial."

The foregoing arguments do not suggest any misuse of the indicated testimony. The question asked of Officer Ridenour was how the gang could benefit from the crime. The fact that people on the street were aware of the crime and that it was perpetrated by Surenos answered that question. The fact neighbors may have been tense following the crime is no surprise, since tension and anxiety is exactly what such gang crimes are intended to create. Officer Ridenour was essentially explaining how the crimes caused their intended result. There is no suggestion either defendant was tied to any of the other described crimes.

Defendant also takes issue with the trial court's suggestion that he would not be prejudiced by the mention of other crimes committed by Surenos in general. He argues: "It is well established that improperly admitted gang evidence creates a substantial danger of undue prejudice precisely because it creates a risk that the jury will improperly infer that the defendant has a criminal disposition."

Defendant cites as support People v. Cardenas (1982) 31 Cal.3d 897 (Cardenas), where the Supreme Court found an abuse of discretion under Evidence Code section 352 in the admission of evidence that the defendant and several of his witnesses were members of the same criminal street gang. In that case, there were no gang charges; the evidence was admitted instead to show bias of the witnesses. The high court concluded such evidence was cumulative in light of other evidence showing the close relationship between the defendant and the witnesses. Hence, the minimal probative value of the evidence was outweighed by its prejudicial effect. (Cardenas, at pp. 904–905.)

Cardenas is clearly inapposite. The court there concluded the evidence was improperly admitted under Evidence Code section 352 because its slight probative value was outweighed by its prejudicial effect. Defendant here did not raise an Evidence Code section 352 objection, so there was no occasion for the trial court to weigh probative value against prejudicial effect. Defendant did not initially object to the evidence as unduly prejudicial. He asserted it should be excluded because it was hearsay and not responsive.

9

Defendant's argument that "improperly admitted gang evidence creates a substantial danger of undue prejudice" merely begs the question of whether the evidence was improperly admitted. And while *improperly* admitted evidence could create a substantial danger of prejudice, so too could *properly* admitted evidence.

"The rule is long established in California that experts may testify as to their opinions on relevant matters and, if questioned, may relate the information and sources on which they relied in forming those opinions. Such sources may include hearsay." (People v. Thomas (2005) 130 Cal.App.4th 1202, 1209.) "Evidence Code section 801 permits an expert to testify to an opinion '[b]ased on matter . . . perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as the basis of his opinion.' (Evid.Code, § 801, subd. (b) . . . .)" (People v. Coleman (1985) 38 Cal.3d 69, 90 (Coleman), disapproved on other grounds in People v. Riccardi (2012) 54 Cal.4th 758, 824, fn. 32.)

The questioning by defense counsel went to the expert's opinion that the shooting of Montejo was for the benefit of the Surenos gang. Ridenour was asked an open-ended question about how the crime could have benefited the gang, thus inviting an open-ended answer. Ridenour explained how the public, and the Nortenos in particular, came to view the crime as part of an increase in violent criminal activity by the Surenos. The answer was responsive.

Defendant argues evidence of other crimes committed by someone else, such as the AM/PM stabbing and shooting mentioned by Ridenour, is not admissible to prove defendant's guilt of the charged offenses. However, while that may be true as far as it goes, the evidence here was not admitted to prove defendant committed the offense but to prove that such offense was for the benefit of the gang. Defense counsel's questioning suggested no such connection existed and challenged the witness to explain otherwise. The witness did so by indicating word on the street was that the murder was part of a pattern of increased gang violence.

Defendant next contends "an expert 'may not under the guise of reasons bring before the jury incompetent hearsay evidence,'" quoting from Coleman, supra, 38 Cal.3d at page 92. According to defendant, "[i]n cases 'where the risk of improper use of the hearsay outweighs its probative value as a basis for the expert opinion it may be necessary to exclude the evidence altogether.'" Defendant argues this is such a case, because the trial court placed no restriction on the jury's use of the evidence. Hence, the jury was not restricted to using the evidence only to test the basis of the expert's opinions.

In Coleman, the high court cautioned: "California law gives the trial court discretion to weigh the probative value of inadmissible evidence relied upon by an expert witness as a partial basis for his

10

opinion against the risk that the jury might improperly consider it as independent proof of the facts recited therein." (<u>Coleman</u>, <u>supra</u>, 38 Cal.3d at p. 91.)  The court continued: "[W]hile an expert may give reasons on direct examination for his opinions, including the matters he considered in forming them, he may not under the guise of reasons bring before the jury incompetent hearsay evidence. [Citation.]  Ordinarily, the use of a limiting instruction that matters on which an expert based his opinion are admitted only to show the basis of the opinion and not for the truth of the matter cures any hearsay problem involved, but in aggravated situations, where hearsay evidence is recited in detail, a limiting instruction may not remedy the problem."  (<u>Id.</u> at p. 92.)  Finally, the court stated: "[T]he trial court must exercise its discretion pursuant to Evidence Code section 352 in order to limit the evidence to its proper uses. The exercise of this discretion may require exclusion of portions of inadmissible hearsay which were not related to the expert opinion. [Citation.]  Or it may be necessary to sever portions of the testimony in order to protect the rights of the defendant without totally destroying the value of the expert witness' testimony. [Citation.]  In still other cases where the risk of improper use of the hearsay outweighs its probative value as a basis for the expert opinion it may be necessary to exclude the evidence altogether." (<u>Id.</u> at pp. 92–93.)

Defendant's argument that an expert may not present incompetent hearsay evidence under the guise of explaining the basis for his opinions again begs the question of whether this was incompetent hearsay evidence.  Likewise as to defendant's further argument that an expert cannot base an opinion on unreliable hearsay.  Defendant asserts "[s]tatements made to police by victims and witnesses are not considered trustworthy."  However, these are the very things gang experts are reasonably expected to rely upon.  In this instance, for example, how else would Officer Ridenour have learned about the perception in the community regarding the charged crime. While the hearsay evidence may not have been admissible to prove a stabbing and shooting occurred at an AM/PM, it would nevertheless be admissible to show how the public viewed the charged crime in context, thereby supporting the expert's opinion that the crime was gang-related.  Defendant points to nothing to suggest the indicated information was any more or less competent or reliable than other such evidence routinely relied upon by gang experts.

Lastly, defendant contends introduction of the hearsay evidence violated his right of confrontation.  "In all criminal prosecutions, the accused has a right, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, 'to be confronted with the witnesses against him . . . .'"  (<u>People v. Thomas</u>, <u>supra</u>, 130 Cal.App.4th at p. 1208.)  "In <u>Crawford</u>, the Supreme Court held that out-of-court statements that are testimonial in nature are inadmissible unless the declarant is unavailable and the accused has had a prior opportunity to cross-examine the declarant."  (<u>Ibid.</u>)

The People contend defendant has forfeited this argument by failing to object below on the basis of <u>Crawford</u>.  However, because the

issue was raised by co-counsel, we conclude it is properly before us.

The initial question in any <u>Crawford</u> analysis is whether the out-of-court statements were testimonial in nature.  The United States Supreme Court did not provide a comprehensive definition in <u>Crawford</u> of what would be considered testimonial, but did provide the following examples: (1) "'ex parte in-court testimony or its functional equivalent - that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,'" and (2) "statements . . . made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  (<u>Crawford</u>, <u>supra</u>, 541 U.S. at pp. 51–52 [158 L.Ed.2d at p. 193].)

There can be no reasonable dispute that the statements at issue here fall outside the examples mentioned by the United States Supreme Court.  These were not custodial examinations of percipient witnesses to the crimes but merely general statements regarding the word on the street as to the effect of the crimes.  There is nothing to suggest the individuals questioned by Officer Ridenour would reasonably have expected their comments to be used in court.

Defendant cites <u>United States v. Mejia</u> (2d Cir. 2008) 545 F.3d 179, to support his contention that the statements at issue here were testimonial.  However, <u>Mejia</u> is clearly inapposite, as it involved an expert who was also the investigating officer in the case and who recited to the jury information that was obtained from a gang member who had been interrogated while in police custody.  (<u>See</u> <u>id.</u> at p. 199.)

"'Hearsay in support of expert opinion is simply not the sort of testimonial hearsay the use of which <u>Crawford</u> condemned.' [Citations.]  'The rule is long established in California that experts may testify as to their opinions on relevant matters and, if questioned, may relate the information and sources on which they relied in forming those opinions.  Such sources may include hearsay.  [Citations.]' [Citation.]  . . . [A]dmission of expert testimony based on hearsay will typically not offend confrontation clause protections because 'an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion.'"  (<u>People v. Sisneros</u> (2009) 174 Cal.App.4th 142, 153–154.)

The question here is whether the trial court erred in denying defendant's motion for mistrial.  "In reviewing rulings on motions for mistrial, we apply the deferential abuse of discretion standard. [Citation.]  'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.]  Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with

considerable discretion in ruling on mistrial motions.  [Citation.]'
[Citation.]"  (People v. Wallace (2008) 44 Cal.4th 1032, 1068.)

Any prejudice to defendant was minimal, inasmuch as the expert
recounted other Surenos crimes as the basis for his opinion that a
primary purpose of the gang was committing crimes.

Furthermore, contrary to defendant's assertions, this was not a close
case.  Defendant relies on his own self-serving statements to police
that he tried to talk Cardenas out of the crime and only followed
behind him as he approached the victim.  But even accepting this as
true, the fact remains that, after defendant was unable to talk
Cardenas out of it, he accompanied Cardenas up the alley knowing
full well Cardenas's intent.  Other evidence also shows defendant
readily participated in the crime thereafter.

We conclude the trial court did not abuse its discretion in denying
defendant's motion for mistrial.

Mendez, 2013 WL 120935, at *2-6.

### 2.  Analysis: Confrontation Clause

The Sixth Amendment to the United States Constitution grants a criminal defendant the

right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  "The 'main and

essential purpose of confrontation is to secure for the opponent the opportunity of cross-

examination.'"  Fenenbock v. Director of Corrections for California, 692 F.3d 910, 919 (9th Cir.

2012) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986)).  The Confrontation

Clause applies to the states through the Fourteenth Amendment.  Pointer v. Texas, 380 U.S. 400,

406 (1965).

In Crawford v. Washington, 541 U.S. 36 (2004), the United States Supreme Court held

that the Confrontation Clause bars the state from introducing into evidence out-of-court

statements which are "testimonial" in nature unless the witness is unavailable and the defendant

had a prior opportunity to cross-examine the witness, regardless of whether such statements are

deemed reliable.  The Crawford rule "has no application to" an "out-of-court nontestimonial

statement."  Id. at 42, 51, 68.  See also Whorton v. Bockting, 549 U.S. 406, 420 (2007).

Although the Supreme Court in Crawford declined to provide a comprehensive definition of the

term "testimonial," it did state that "[s]tatements taken by police officers in the course of

interrogations are . . . testimonial under even a narrow standard."  Crawford, 541 U.S. at 52.  The

1   court also provided the following "formulations" of a "core class" of testimonial statements:  (1)

2   "ex parte in-court testimony or its functional equivalent – that is, material such as affidavits,

3   custodial examinations, prior testimony that the defendant was unable to cross-examine, or

4   similar pretrial statements that declarants would reasonably expect to be used prosecutorially;"

5   (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits,

6   depositions, prior testimony, or confessions;" and (3) "statements that were made under

7   circumstances which would lead an objective witness reasonably to believe that the statement

8   would be available for use at a later trial."  Id. at 51-52.

9          The Confrontation Clause "has no application to out-of-court statements that are not

10   offered to prove the truth of the matter asserted."  Williams v. Illinois, 132 S. Ct. 2221, 2228

11   (2012).  See also Crawford, 541 U.S. at 59 n.9 (noting that the Confrontation Clause "does not

12   bar the use of testimonial statements for purposes other than establishing the truth of the matter

13   asserted").  Thus, "[u]nder settled evidence law, an expert may express an opinion that is based

14   on facts that the expert assumes, but does not know, to be true."  Williams, 132 S. Ct. at 2228.

15   Since the decision in Crawford, numerous federal courts have held that the introduction of

16   otherwise inadmissible hearsay evidence in support of a gang expert witness' testimony does not

17   violate the Confrontation Clause.  See e.g., United States v. Palacios, 677 F.3d 234, 243-44 (4th

18   Cir. 2012); United States v. Ayala, 601 F.3d 256, 275 (4th Cir. 2010); Alejandre v. Brazelton, No.

19   C 11-4803 CRB (PR), 2013 WL 1729775, at **10 -11  (N.D. Cal. April 22, 2013) (expert

20   witness' testimony concerning the meaning of defendant's tattoos based in part on hearsay

21   statements from an undisclosed parolee did not violate Confrontation Clause); Lee v. Gipson, No.

22   11-cv-2855 MCE KJN P, 2012 WL 5349506 (E.D. Cal. Oct. 26, 2012 (concluding that Crawford

23   does not undermine the established rule that experts can testify to their opinions on relevant

24   matters and may relate the information and sources upon which they rely in forming those

25   opinions)); Lopez v. Horel, Civ. No. 07-4169, 2011 WL 940054, at *11 (C.D. Cal. Jan. 19, 2011)

26   ("Thus, Crawford does not undermine the established rule that experts can testify to their opinions

27   on relevant matters and may relate the information and sources upon which they rely in forming

28   those opinions"); Her v. Jacquez, No. 2:09-cv-612 JAM TJB, 2011 WL 1466868, at *33 (E.D.

1    Cal. Apr. 18, 2011) (gang expert's testimony about specific gangs and their activities and

2    membership, based on information imparted to him by others, did not violate Confrontation

3    Clause because underlying information not offered for its truth but merely to support expert's

4    opinion); Walker v. Clark, No. CV 08-5587-CJC (JEM), 2010 WL 1643580, at *15 n.8 (C.D. Cal.

5    Feb. 18, 2010) (citing cases); Lopez v. Jacquez, No. 1:09-CV1451 AWI JMD HC, 2010 WL

6    2650695, at *5 (E.D. Cal. July 1, 2010) ("[T]he Court does not find that an objective application

7    of Crawford would result in a finding that the gang expert's reliance on hearsay testimony to

8    explain his opinion that Petitioner was a member of the West Fresno Nortenos, and that the West

9    Fresno Nortenos area criminal street gang, to be in violation of Petitioner's Confrontation Clause

10   rights"); Cason v. Hedgpeth, No. CV 08-4576 -JVS (RNB), 2009 WL 1096209, at *13-14 (C.D.

11   Cal. Apr. 22, 2009) (hearsay evidence regarding the witness's gang membership did not violate

12   Crawford because it was admitted not for the truth of the matter asserted but to support

13   detective's opinion that witness was a gang member); Eddington v. Adams, No. CV F 06-1770

14   DLB HC, 2008 WL 397290, at *10 (E.D. Cal. Feb. 8, 2008) (gang expert's reliance on gang

15   member's statement as part of basis for opinion did not violate Crawford)"); Ortiz v. Tilton, Civ.

16   No. 06-1752-L (CAB),  2008 WL 2543440, at *16 (S.D. Cal. May 5, 2008) (gang expert's

17   reliance on field investigation reports, defendants' admissions as to gang member status, and

18   other hearsay as basis for opinion did not violate Crawford because materials were not admitted

19   for truth of the matter asserted and his reliance on them was subject to cross-examination);

20   Nguyen v. Evans, No. C 06-04630 JSW, 2008 WL 1994902, at *5 (N.D. Cal. May 5, 2008) (gang

21   expert's testimony regarding information he received from other gang members and victims,

22   which he used as a basis for his opinion, did not violate Crawford); Thomas v. Chromes, No. ED

23   CV 06-00787-JFW (VBK), 2008 WL 4597214, at *7 (C.D. Cal. Oct. 10, 2008) (gang expert's

24   reliance on gang members' statements as basis for opinion that petitioner was a gang member did

25   not violate Crawford).

26          This court agrees with the California Court of Appeal that the admission into evidence of

27   Detective Ridenour's testimony did not violate petitioner's rights under the Confrontation Clause.

28   As noted by the Court of Appeal, Ridenour's testimony was not offered for the truth of the

1    information asserted, but as a foundation for his expert opinion that the murder of Montejo could

2    have been committed for the benefit of the Sureno street gang even though there was no outward

3    evidence that this was the case.  Ridenour's testimony was also offered in response to a direct

4    question from counsel for petitioner's co-defendant.  As an expert, Detective Ridenour could

5    properly base his opinion on inadmissible evidence, including hearsay, of a kind that experts in

6    the field regularly consult.  Williams, 132 S. Ct. 2228.  Thus his opinion could include interviews

7    with neighborhood residents about their reactions and opinions with respect to violent acts

8    committed by gangs.

9           Even if the statements relied on by Detective Ridenour in forming his opinion testimony

10   could be considered testimonial in nature, their admission did not implicate petitioner's right to

11   confrontation.  As explained by the court in United States v. Johnson, 587 F.3d 625, 635 (4th Cir.

12   2009):

13              An expert witness's reliance on evidence that Crawford would bar
                if offered directly only becomes a problem where the witness is
14              used as little more than a conduit or transmitter for testimonial
                hearsay, rather than as a true expert whose considered opinion
15              sheds light on some specialized factual situation.   Allowing a
                witness simply to parrot "out-of-court testimonial statements of
16              cooperating witnesses and confidential informants directly to the
                jury in the guise of expert opinion" would provide an end run
17              around Crawford.  United States v. Lombardozzi, 491 F.3d 61, 72
                (2d Cir. 2007).  For this reason, an expert's use of testimonial
18              hearsay is a matter of degree.  See Ross Andrew Oliver, Note,
                Testimonial Hearsay as the Basis for Expert Opinion:  The
19              Intersection of the Confrontation Clause and Federal Rule of
                Evidence 703 After Crawford v. Washington, 55 Hastings L. J.
20              1539, 1560 (2004) (describing a "continuum of situations" in which
                experts rely on testimonial hearsay).  The question is whether the
21              expert is, in essence, giving an independent judgment or merely
                acting as a transmitter for testimonial hearsay.  As long as he is
22              applying his training and experience to the sources before him and
                reaching an independent judgment, there will typically be no
23              Crawford problem.   The expert's opinion will be an original
                product that can be tested through cross-examination.
24

25   See also United States v. Law, 528 F.3d 888, 911-12 (D.C. Cir. 2008) (finding no Confrontation

26   Clause violation based on admission of an expert's testimony because the expert did not simply

27   convey statements by other declarants).

28          In this case, Detective Ridenour was not merely a conduit or transmitter of testimonial

                                                16

1   hearsay.  Rather, in response to a question asked by defense counsel he offered his expert opinion

2   based on information he had gathered from his sources on the street.  Although that information

3   included a generalized description of specific crimes, Ridenour did not elaborate on those crimes

4   or connect petitioner or his co-defendant with their commission.  In addition, petitioner was given

5   the opportunity to cross-examine Detective Ridenour about his opinions as well as the basis of his

6   opinions, and the jury was able to judge Ridenour's credibility in light of the sources he described

7   in his testimony.

8         For the foregoing reasons, the state courts' conclusion that Detective Ridenour's expert

9   testimony did not violate petitioner's rights under the Confrontation Clause is not contrary to or

10  an unreasonable application of clearly established federal law or an unreasonable determination

11  of the facts in light of the state court record.  Accordingly, petitioner is not entitled to federal

12  habeas relief with respect to this claim.

13                    **3. Analysis: Due Process**

14        Petitioner is not entitled to federal habeas relief on his claim that the trial court violated

15  his right to due process in failing to grant his motion for mistrial based on the admission of

16  Detective Ridenour's testimony.  As noted above, errors of state law, which would include errors

17  in admitting evidence or in denying a motion for mistrial, do not warrant the granting of federal

18  habeas relief.  Estelle, 502 U.S. at 67.  The only issue before this court is whether the admission

19  of Detective Ridenour's testimony "rendered the trial fundamentally unfair in violation of due

20  process."  Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995) (citing Estelle, 502 U.S. at 67-68).

21        "On habeas review, constitutional errors of the 'trial type,' . . ., warrant relief only if they

22  'had substantial and injurious effect or influence in determining the jury's verdict.'"  Wood v.

23  Ryan, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637-38

24  (1993)).  See also Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (1991) (erroneous admission of

25  evidence in a state trial denies a defendant due process only when the evidence "so fatally

26  infect[s] the proceedings as to render them fundamentally unfair").  The Ninth Circuit has

27  observed that:

28  ////

17

1
2
3
4

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process.  Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair (citation omitted), it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

5  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).  Therefore, "under AEDPA, even

6  clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit

7  the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as

8  laid out by the Supreme Court."  Holley, 568 F.3d at 1101.  See also Greel v. Martel, No. 10-

9  16847, 472 Fed. Appx. 503, 504, 2012 WL 907215, *1 (9th Cir. Mar. 19, 2012) ("There is

10  likewise no clearly established federal law that admitting prejudicial evidence violates due

11  process.").

12      The admission into evidence of Detective Ridenour's testimony was not so unduly

13  prejudicial as to "necessarily" prevent a fair trial.  He simply responded to a question asked by

14  co-defendant's counsel about how it was possible the Montejo murder was committed to benefit a

15  street gang given the lack of any outward signs to that effect.  Although he mentioned some

16  specifics, he did not connect petitioner to any of the acts he described.  Ridenour's testimony in

17  this regard did not render petitioner's trial fundamentally unfair.  It is true that the trial judge

18  stated that Detective Ridenour's testimony went "too far."  However, he also stated that

19  Ridenour's answer was "responsive in the sense that he is trying to explain how the word gets

20  around" and "I don't think that [Ridenour] has done anything to prejudice your clients in the

21  sense that he is talking about Surenos in general, not about your two particular clients, so I don't

22  think it's grounds for a mistrial."  (Reporter's Transcript on Appeal (RT) at 2153.)  The trial

23  judge also stated, "I don't think it's going to do a bit of good to say forget the business about the

24  other crimes that the Surenos commit because we all know they commit other crimes anyway,

25  and so I think it's just going to make it worse."  (Id. at 2159.)  Read as a whole, the trial judge's

26  statements clarify that he did not believe Detective Ridenour's testimony was unduly prejudicial.

27      The court also notes that petitioner's jurors were instructed that in evaluating the

28  testimony of an expert witness, they should consider "the facts or information on which the expert

18

relied in reaching [their] opinion," and "whether information on which the expert relied was true and accurate." (Clerk's Transcript on Appeal (CT) at 1197.)  The jurors were also instructed to "examine the reasons given for each opinion and the facts or other matters on which each witness relied." (Id.)  See also id. at 1240 (instructing the jury to consider "evidence of gang activity only for the limited purpose" of, among other things, considering "the facts and information relied on by an expert witness in reaching his or her opinion").  These jury instructions would have lessened any prejudicial impact of Ridenour's testimony.  As the United States Supreme Court observed in another case, petitioner's trial "was not perfect, few are, but neither was it fundamentally unfair." Darden v. Wainwright, 477 U.S. 168, 183 (1986).  In sum, Ridenour's testimony was not so prejudicial that the trial court's failure to grant a mistrial gave rise to a due process violation.

As in the claim above, petitioner has failed to demonstrate that the decision of the California Court of Appeal rejecting his due process claim was contrary to or an unreasonable application of federal law.  He has certainly failed to show that the state appellate court's thoughtful and thorough opinion was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.  Accordingly, he is not entitled to federal habeas relief.

## B. Cruel and Unusual Punishment

In his next ground for habeas relief, petitioner claims that his sentence of life without parole on his first degree murder conviction constitutes cruel and unusual punishment. (ECF No. 1 at 40.)  Petitioner argues that he was an "immature and uneducated 18-year old non-shooter who neither killed nor intended to kill, and who had no history of violence." (Id.)  He argues that, under these circumstances, his sentence is unduly harsh.

### 1. State Court Decision

The California Court of Appeal denied this claim, reasoning as follows:

> Defendant contends that, given his young age, disadvantaged family background and limited intelligence, coupled with his minor role in the attempted robbery and murder, the LWOP sentence imposed in this matter amounts to cruel and unusual punishment. Defendant points out he turned 18 only a few months before the

offenses, was one of 15 children born to a Mexican immigrant family, still lived with his parents, dropped out of school in the tenth grade, had been an agricultural field worker since the age of 17, could not spell his own middle name or the name of his brother, jumped into the Vickystown Surenos at the age of 16, and had no adult convictions or history of violence. As to the offenses, defendant contends he was a reluctant participant and the only evidence to the contrary came from the questionable testimony of two possible accomplices. Defendant asserts he "specifically obtained Cardenas's assurance that the victim would not be hurt" and "reluctantly" participated in an attempted robbery "that went awry when the gun held by his codefendant accidentally went off."

The Eighth Amendment to the United States Constitution "'forbids only extreme sentences that are "grossly disproportionate" to the crime.'" (People v. Cartwright (1995) 39 Cal.App.4th 1123, 1135.) A punishment also may violate the California Constitution if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (In re Lynch (1972) 8 Cal.3d 410, 424, fn. omitted (Lynch).) In Lynch, the California Supreme Court suggested three areas of focus: (1) the nature of the offense and the offender; (2) a comparison with the punishment imposed for more serious crimes in the same jurisdiction; and (3) a comparison with the punishment imposed for the same offense in different jurisdictions. (Id. at pp. 425–427.) Disproportionality need not be established in all three areas. (People v. Dillon (1983) 34 Cal.3d 441, 487, fn. 38.)

The United States Supreme Court has identified two classes of cases that violate the proportionality standard. "The first involves challenges to the length of term-of-years sentences given all the circumstances in a particular case. The second comprises cases in which the Court implements the proportionality standard by certain categorical restrictions . . . ." (Graham v. Florida (2010) _____ ___ U.S. ____ [176 L.Ed.2d 825, 836].) This second classification, in turn, "consists of two subsets, one considering the nature of the offense, the other considering the characteristics of the offender." (Id. at p. ____ [176 L.Ed.2d at p. 836].) Under the first subset, the high court has barred capital punishment for non-homicide offenses committed by anyone. (Kennedy v. Louisiana (2008) 554 U.S. 407, ____ [171 L.Ed.2d 525, 534].) Under the second, the court has barred capital punishment for minors, even if they commit murder. (Roper v. Simmons (2005) 543 U.S. 551, 578 [161 L.Ed.2d 1, 28].)

Defendant clearly does not qualify under either of the categorical prohibitions. This case involves a murder, and defendant was not a minor at the time of the killing. Thus, defendant's claim is that the LWOP sentence is disproportional to the crime and/or the criminal. However, in this regard, defendant's claim is premised on a false and misleading narrative.

Regarding the offender, defendant asserts both that he was barely 18 at the time of the offenses and he had no adult convictions. Of course, since defendant had been an adult for only a few months, it is not surprising he had no adult convictions. Defendant would had

to have committed a crime and been convicted of it in a very short span of time. At any rate, defendant admitted to probation that he had stolen cars with other gang members, and the probation report indicates he had juvenile offenses that "are numerous or of increasing seriousness."

The fact that defendant was one of 15 children born of Mexican immigrants would not appear to provide any excuse for his actions. The probation report indicates defendant reported that all his family members are hard workers, his older siblings are married with children, and he was not a victim of abuse, neglect or molestation. Nor would the facts that defendant was employed as a field worker and lived with his parents have any bearing on his susceptibility to crime. And while defendant may have dropped out of school in the 10th grade, this coincides with his having joined the gang at the age of 16 and suggests nothing more than that defendant voluntarily chose to pursue the gang lifestyle rather than an education. Finally, there is nothing in this record to suggest defendant's purported regular use of alcohol and drugs contributed to the offenses in this matter.

More importantly, defendant's characterization of his involvement in these offenses is based exclusively on his own self-serving statements to police. Those statements came during an interview in which defendant repeatedly demonstrated his willingness to lie to the officers in an effort to downplay his culpability. Defendant revealed only as much as he thought the officers already knew. Other evidence showed defendant was fully aware that Cardenas was armed and voluntarily accompanied his fellow gang member in pursuit of the victim in order to commit a robbery. Defendant asserts the gun accidentally went off, but the fact remains the gun was intentionally utilized in the crime to effectuate the robbery.

In light of the circumstances of the offenses and the offender, we cannot agree an LWOP sentence constitutes cruel and unusual punishment under either the state or federal Constitution.

Mendez, 2013 WL 120935, at *18-20.

## 2. Applicable Law and Analysis

The Eighth Amendment to the United States Constitution proscribes "cruel and unusual punishments." U.S. Const. amend. VIII. The United States Supreme Court has held that the Eighth Amendment includes a "narrow proportionality principle" that applies to terms of imprisonment. See Graham v. Florida, 560 U.S. 48, 60 (2010); Harmelin v. Michigan, 501 U.S. 957, 996 (1991). See also Taylor v. Lewis, 460 F.3d 1093, 1097 (9th Cir. 2006). However, the precise contours of this principle are unclear, and successful challenges in federal court to the proportionality of particular sentences are "exceedingly rare." Solem v. Helm, 463 U.S. 277,

1   289-90 (1983).  See also Ramirez v. Castro, 365 F.3d 755, 775 (9th Cir. 2004).  "The Eighth

2   Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids

3   only extreme sentences that are 'grossly disproportionate' to the crime."  Harmelin, 501 U.S. at

4   1001 (Kennedy, J., concurring) (citing Solem v. Helm).

5          In assessing the compliance of a non-capital sentence with the proportionality principle, a

6   reviewing court must consider "objective factors" to the extent possible.  Solem, 463 U.S. at 290.

7   Foremost among these factors are the severity of the penalty imposed and the gravity of the

8   offense.  "Comparisons among offenses can be made in light of, among other things, the harm

9   caused or threatened to the victim or society, the culpability of the offender, and the absolute

10  magnitude of the crime."  Taylor, 460 F.3d at 1098.

11         The following decisions of the United States Supreme Court illustrate these principles.  In

12  Harmelin, the Supreme Court upheld a life sentence without the possibility of parole for a first-

13  time offender convicted of possessing 672 grams of cocaine.  Harmelin, 501 U.S. at 961.  In

14  Lockyer v. Andrade, the Supreme Court held that it was not an unreasonable application of

15  clearly established federal law for the California Court of Appeal to affirm a "Three Strikes"

16  sentence of two consecutive 25 year-to-life imprisonment terms for a petty theft with a prior

17  conviction involving theft of $150.00 worth of videotapes.  Andrade, 538 U.S. at 75.  In Hutto v.

18  Davis, 454 U.S. 370 (1982), the Supreme Court upheld the defendant's sentence of 40 years in

19  prison after his conviction for possession of nine ounces of marijuana and drug paraphernalia.

20  Hutto, 454 U.S. at 370.  Finally, in Rummel v. Estelle, 445 U.S. 263 (1980), the Supreme Court

21  upheld a sentence of life with the possibility of parole for a defendant's third nonviolent felony:

22  obtaining money by false pretenses.

23         Pursuant to the authorities cited above, the sentence imposed on petitioner, while

24  extremely harsh, is not grossly disproportionate to his first degree murder conviction.  Petitioner's

25  crime is more serious than the drug possession in Harmelin, the petty theft convictions before the

26  court in Andrade, the conviction for obtaining money under false pretenses at issue in Rummel,

27  and the conviction for possession of .036 grams of cocaine in Taylor, all of which involved the

28  imposition of sentences which were upheld against an Eighth Amendment challenge.  See also

22

1   Hutto, 454 U.S. at 372 (the United States Supreme Court "has never found a sentence for a term

2   of years within the limits authorized by statute to be, by itself, a cruel and unusual punishment.").

3   This is not a case where "a threshold comparison of the crime committed and the sentence

4   imposed leads to an inference of gross disproportionality." Solem, 463 U.S. at 1004-05.  Because

5   petitioner does not raise an inference of gross disproportionality, this court need not compare

6   petitioner's sentence to the sentences of other defendants in other jurisdictions.  Harmelin, 501

7   U.S. at 1005; United States v. Meiners, 485 F.3d 1211, 1213 (9th Cir. 2007) ("in the rare case in

8   which a threshold comparison [of the crime committed and the sentence imposed] leads to an

9   inference of gross disproportionality, we then compare the sentence at issue with sentences

10  imposed for analogous crimes in the same and other jurisdictions.").

11          Petitioner notes that his eighteenth birthday was less than 4 months before the murder was

12  committed.  (ECF No. 1 at 40.)  It is true that Eighth Amendment jurisprudence with respect to

13  life sentences for juveniles is different than that for adults.  See, e.g., Thompson v. Oklahoma,

14  487 U.S. 815, 823 (1988) (the Eighth and Fourteenth Amendments prohibit the execution of a

15  fifteen year-old defendant convicted of first degree murder); Roper v. Simmons, 543 U.S. 551

16  (2005) (the Eighth and Fourteenth Amendments prohibit the execution of defendants under the

17  age of eighteen); Graham v. Florida, 560 U.S. 48 (2010) (the Eighth Amendment prohibits the

18  imposition of a sentence of life without parole on a juvenile offender who did not commit

19  homicide); Miller v. Alabama, 132 S. Ct. 2455 (2012) (a mandatory sentence of life without the

20  possibility of parole for those under the age of 18 at the time of their crimes violates the Eighth

21  Amendment's prohibition on cruel and unusual punishment).  However, these cases do not dictate

22  the result in this case because petitioner was not a juvenile at the time he committed his crimes.

23          Based on the authorities cited above, the decision of the California Court of Appeal

24  rejecting petitioner's argument that his sentence constitutes cruel and unusual punishment in

25  violation of the Eighth Amendment is neither contrary to nor an unreasonable application of well-

26  established federal law.  Accordingly, petitioner is not entitled to federal habeas relief with

27  respect to this claim.

28  ////

## C. Insufficient Evidence

Petitioner raises two claims of insufficient evidence.  After setting forth the applicable legal standards, the court addresses these claims in turn below.

### 1. Applicable Legal Principles

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318).  Put another way, "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 132 S. Ct. 2, *4 (2011).

In conducting federal habeas review of a claim of insufficient evidence, "all evidence must be considered in the light most favorable to the prosecution." Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011).  "Jackson leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial," and it requires only that they draw "'reasonable inferences from basic facts to ultimate facts.'" Coleman v. Johnson, 132 S. Ct. 2060, 2064 (2012) ( per curiam ) (citation omitted).  "'Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'" Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir.1995) (citation omitted).

 "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In order to grant relief, the federal habeas court must find that the decision of the state court rejecting an  insufficiency of the evidence claim reflected an objectively unreasonable application of Jackson and Winship to the facts of the

1   case.  Ngo, 651 F.3d at 1115; Juan H., 408 F.3d at 1275 & n.13.  Thus, when a federal habeas

2   court assesses a sufficiency of the evidence challenge to a state court conviction under AEDPA,

3   "there is a double dose of deference that can rarely be surmounted."  Boyer v. Belleque, 659 F.3d

4   957, 964 (9th Cir. 2011).  The federal habeas court determines sufficiency of the evidence in

5   reference to the substantive elements of the criminal offense as defined by state law.  Jackson,

6   443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

7                          **2.  Robbery Special Circumstance**

8           In his third ground for relief, petitioner claims that the evidence is insufficient to support

9   the robbery special circumstance "because the evidence does not support a finding that

10  [petitioner] acted either with the intent to kill or with reckless disregard for human life."  (ECF

11  No. 1 at 48.)  In a thorough and careful decision, the California Court of Appeal denied this

12  claim, reasoning as follows:

13              Under section 190.2, a defendant found guilty of first degree
            murder is subject to a penalty of death or life without the possibility
14          of parole (LWOP) if one of various special circumstances is found
            true.  One such special circumstance is where "[t]he murder was
15          committed while the defendant was engaged in, or was an
            accomplice in, the commission of, attempted commission of, or the
16          immediate flight after committing, or attempting to commit" one or
            more of various enumerated felonies, including robbery.  (§ 190.2,
17          subd. (a)(17).)  For the actual killer, intent to kill is not an element
            of the special circumstance charge.  However, for an aider and
18          abettor, the prosecution must prove the defendant either intended to
            kill (§ 190.2, subd. (c)) or was a major participant in the underlying
19          felony and acted with reckless indifference to human life (§ 190.2,
            subd. (d)).
20
            Defendant contends there is no evidence either that he intended to
21          kill the victim or that he acted with reckless indifference to the
            victim's life.  Hence, he argues, the special circumstance finding
22          cannot stand.  According to defendant, there is insufficient evidence
            he knew before the actual shooting that Cardenas was likely to fire
23          or was likely to harm anyone.  Rather, defendant argues, "the
            evidence tended to show that both defendants were completely
24          surprised when the gun went off, as they immediately ran away in a
            panic without taking the victim's property."  Furthermore,
25          defendant first tried to talk Cardenas out of the crime and
            eventually went along only because Cardenas promised the victim
26          would not be hurt.

27          """To determine the sufficiency of the evidence to support a
            conviction, an appellate court reviews the entire record in the light
28          most favorable to the prosecution to determine whether it contains

                                        25

evidence that is reasonable, credible, and of solid value, from which a rationale trier of fact could find the defendant guilty beyond a reasonable doubt.'" [Citations.]   '"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment."' [Citations.]   The standard of review is the same when the prosecution relies mainly on circumstantial evidence.  [Citation.]" (People v. Valdez (2004) 32 Cal.4th 73, 104.)

As commonly understood, the term "reckless indifference to human life" means "that the defendant was subjectively aware that his or her participation in the felony involved a grave risk of death." (People v. Estrada (1995) 11 Cal.4th 568, 577.)

 In People v. Hodgson (2003) 111 Cal.App.4th 566 (Hodgson), the Court of Appeal found sufficient evidence to support a robbery special circumstance where the defendant held open the electric gate of an underground parking garage to facilitate the escape of his fellow gang member, Salazar, who robbed and shot to death a woman who had opened the gate to enter.  (Hodgson, at p. 568.) While the defendant stood at the gate, Salazar approached the victim's car and shot out one of the windows.  After the car rolled forward and into a pillar and a parked car, Salazar fired another bullet through the window and into the victim's head.  (Id. at p. 570.)

The court concluded the defendant was a major participant in the crime, notwithstanding the fact he did not supply the murder weapon, was not himself armed, and did not take anything from the victim.  (Hodgson, supra, 111 Cal.App.4th at p. 579.)  The court explained there were only two participants in the crime, rather than a "coterie of confederates," and the defendant's actions were essential in assisting his fellow gang member's escape.  (Id. at pp. 579–580.)  The court further concluded a rational trier of fact could have found sufficient evidence that the defendant acted with reckless indifference to human life.  The court explained: "Even after the first shot it must have been apparent to appellant Ms. Nam had been severely injured and was likely unconscious.  Her car rolled into the garage and collided with a pillar and another car. Appellant had to be aware use of a gun to effect the robbery presented a grave risk of death.  However, instead of coming to the victim's aid after the first shot, he instead chose to assist Salazar in accomplishing the robbery by assuming his position at the garage

gate and trying to keep it from closing until Salazar could escape from the garage with the loot."  (Id. at p. 580.)  In People v. Smith (2005) 135 Cal.App.4th 914, Taffolla stood outside the victim's motel room while Smith entered and beat her to death in the course of a robbery.  The Court of Appeal found sufficient evidence to support the finding that Taffolla acted with reckless indifference to human life for purposes of a robbery special circumstance finding. According to the court: "Even if Taffolla remained outside [the victim]'s room as a lookout, the jury could have found Taffolla gained a 'subjective awareness of a grave risk to human life' during

26

the many tumultuous minutes it would have taken for [the victim] to be stabbed and slashed 27 times, beaten repeatedly in the face with a steam iron, and had her head slammed through the wall. In addition, when Smith emerged from her room covered in enough blood to leave a trail from the motel to McFadden Street, Taffolla chose to flee rather than going to [the victim]'s aid or summoning help." (Id. at p. 927.)

In neither of the foregoing cases did the defendant participate in the actual killing except as a lookout. In the present matter, defendant's participation was more direct. He stood alongside Cardenas as they attempted to rob the victim. On the other hand, in the foregoing cases, the defendant had an opportunity to intervene to stop the killing while it was in progress but chose not to do so. In the present matter, there was only one shot, after which defendant and Cardenas immediately fled.

Defendant relies on two out-of-state decisions: Jackson v. Florida (Fla.1991) 575 So.2d 181 (Jackson); and State v. Lacy (Ariz.1996) 929 P.2d 1288 (Lacy). In Jackson, the evidence established that the defendant and his brother were at the scene of a murder and the defendant had previously expressed an intent to rob the victim. However, there were no eyewitnesses to the actual killing. The defendant was convicted of felony murder and sentenced to death, but the Florida Supreme Court reversed the sentence. The court explained that, while the defendant was clearly a major participant in the underlying felony, there was insufficient evidence that he acted with a reckless disregard for human life. In particular, there was no evidence the defendant possessed or fired a weapon, harmed the victim, intended to harm the victim when he entered the store, or expected violence to erupt. (Jackson, at pp. 192–193.) There was also no evidence that the defendant had a chance to prevent the murder, since it happened quickly. (Id. at p. 193.)

In Lacy, two women were found dead in an apartment. One woman had been shot three times and received a blunt force injury to her head and scratches on her arm. The other woman had been shot twice, once in the face and once in the back of the head. (Lacy, supra, 929 P.2d at pp. 1292–1293.) The defendant later gave a statement to police implicating himself and a man named Stubblefield in the killings. However, the defendant claimed Stubblefield alone had killed the women while the defendant tried to get him to depart. The defendant eventually grabbed a microwave and ran out the door of the apartment. Stubblefield later picked him up and took him home. The two men were tried separately and Stubblefield was acquitted. However, the defendant was convicted of first degree murder and sentenced to death. (Id. at p. 1293.)

The Arizona Supreme Court reversed the sentence, finding insufficient evidence that the defendant acted with reckless indifference to human life. The only evidence of what occurred inside the apartment was the defendant's statement to police. According to the court: "Here, other than what defendant described, there is little to establish his involvement in the deaths of these

young women.  We know that, at a minimum, he stole a microwave after one of the murders and did nothing to prevent either victim's death.  While this may demonstrate callousness and a shocking lack of moral fiber, it does not alone rise to the level of reckless indifference."  (Lacy, supra, 929 P.2d at p. 1300.)  The court continued: "We do not suggest that defendant's tale must be accepted at face value.  Without his statement, however, we are left with an almost complete void as to what occurred that night.  His fingerprints were nowhere to be found, it is unclear whether he knew Stubblefield had a gun, and it is uncertain that he should have anticipated violence."  (Ibid.)

Similar to the foregoing cases, there is no evidence here as to what occurred in the alley other than defendant's statements to the police and the testimony of Martha and Carina about what defendant and Cardenas said after they returned to the car.  However, in the present matter, there is evidence that defendant conspired with Cardenas to rob the victim, defendant was either armed or knew Cardenas was armed with a handgun, and the two proceeded in the direction of the victim to carry out their plan.  It is also clear that, after the shooting, defendant ran from the scene with Cardenas rather than render aid to the victim.

In People v. Mora (1995) 39 Cal.App.4th 607 (Mora), Mora and Arredondo conspired to rob a drug dealer named Minard.  Minard and a friend named Nale were at Minard's home at 1:30 a.m. watching television and smoking marijuana when Mora knocked on the door.  Nale had previously introduced Mora to Minard for the purpose of buying drugs and admitted Mora into the home.  Arredondo later knocked on the door, and Mora asked if his friend could come in and use the bathroom.  However, when the door was opened, Arredondo pushed his way in pointing a high-powered rifle.  Arredondo instructed Minard to "get his boxes of shit," and, as Minard began to get up, Mora grabbed him.  A tussle ensued during which Arredondo fired a shot into Minard's chest.  Minard fell to his knees, Mora pushed him the rest of the way down, and Arredondo shot Minard in the back.  Each gun wound was fatal.  (Mora, supra, 39 Cal.App.4th at p. 611.)  Mora later gave a statement to police claiming that he never intended that anybody die.  (Id. at p. 612.)

The Court of Appeal concluded there was sufficient evidence to support a finding that Mora acted with reckless disregard for human life.  Even assuming Mora did not intend that the victim be killed, he "admitted planning to go to a drug dealer's home at night to rob him by having Arredondo enter with a rifle which fired three-inch bullets.  [Mora] had to be aware of the risk of resistance to such an armed invasion of the home and the extreme likelihood death could result.  [Citation.]  According to [Mora]'s own statement he did not know whether Minard was dead or alive.  He did not attempt to aid the victim but instead carried through with the original plan to steal the victim's drugs.  [Mora] personally carried away the loot, left the victim there to die, and threatened the remaining victim Nale."  (Mora, supra, 39 Cal.App.4th at p. 617.)

In the present matter, the jury was not required to accept defendant's self-serving description of the offenses at face value. Defendant first denied even being present at Jose P.'s house. After being told the police knew he was there, defendant admitted being present, but claimed Cardenas wanted him to go along but he refused, Cardenas went alone, and defendant heard a gunshot. However, when told that bank surveillance cameras showed him with Cardenas in the alley, defendant admitted he went along but claimed he first tried to talk Cardenas out of it. He also claimed he did not know Cardenas was armed. Defendant then said he ran away after the shooting only because Cardenas ran and that Cardenas claimed when he got to the car that the gunshot had been accidental. It is clear from the foregoing that defendant revealed to police only as much as he was required to reveal based on what the officers claimed they already knew.

Both Martha M. and Carina G. testified that Cardenas expressed an intent to steal the victim's cell phone and, a couple minutes later, engaged in a discussion with defendant at the rear of Carina's car. The two then departed up the alley in the direction of the victim. Shortly thereafter, the shooting occurred and both defendants fled the scene, leaving the victim lying in the alley. Martha testified she saw the two men running and, when they got in the car, they were laughing. Carina testified she told the police that defendant said he told Cardenas just to scare the victim and defendant was going to search the victim when he heard the gunshot. There was also testimony that defendant had been seen earlier in a group of men with Cardenas passing around a handgun.

As in <u>Mora</u>, the two perpetrators planned to rob the victim at gunpoint. Also as in <u>Mora</u>, defendant was actively assisting his armed confederate in the attempted robbery when the latter shot the victim. Further as in <u>Mora</u>, both perpetrators fled the scene without rendering assistance following the allegedly unintended shooting. The only difference here, which also distinguishes this matter from <u>Hodgson</u>, is that the victim was not shot twice and, hence, defendant did not have as great an opportunity to intervene and stop the killing. However, we do not find this distinction to be significant under the circumstances. When defendant accompanied his confederate up that ally to assist in a robbery, he knew Cardenas was armed and had to be aware of the risk of resistance to such a crime and the extreme likelihood death could result. This is sufficient to support the finding that he acted with reckless disregard for human life.

<u>Mendez</u>, 2013 WL 120935, at *8-11.

After reviewing the state court record in the light most favorable to the jury's verdict, and for the reasons expressed by the California Court of Appeal, this court concludes that there was sufficient evidence introduced at petitioner's trial to support the robbery special circumstance. The court reaches this conclusion even though there was evidence which supports petitioner's

1 | argument that he did not act with intent to kill or with reckless disregard for human life.  The

2 | question in this federal habeas action is not whether there was evidence from which the jury could

3 | have found for the petitioner on this issue.  Rather, in order to obtain federal habeas relief,

4 | petitioner must demonstrate that the state courts' denial of relief was an objectively unreasonable

5 | application of the decisions in <u>Jackson</u> and <u>Winship</u> to the facts of this case.  Specifically, he must

6 | show that no rational trier of fact could have found the essential elements of the robbery special

7 | circumstance allegation beyond a reasonable doubt and that no rational trier of fact could have

8 | agreed with the jury's decision on this issue.  Petitioner has failed to make this showing, or to

9 | overcome the "double dose" of deference due to the state court's findings of fact and its analysis

10 | of this claim.  Accordingly, he is not entitled to federal habeas relief on this claim of insufficient

11 | evidence.

### 3. Active Gang Participation

13 | In his fifth ground for federal habeas relief, petitioner claims that the evidence was

14 | insufficient to support his conviction for active participation in a criminal street gang.  He argues

15 | that Detective Ridenour's testimony was insufficient to demonstrate that at the time of the

16 | charged offenses the primary activities of the Surenos street gang included the commission of

17 | predicate offenses listed in Cal. Penal Code § 186.22(e).  (ECF No. 1 at 59-71.)

18 | The California Court of Appeal denied this claim, largely on state law grounds.  The court

19 | reasoned as follows:

> Defendant contends his conviction for active participation in a criminal street gang must be reversed because the prosecution failed to prove the Surenos are a criminal street gang within the meaning of section 186.22.
>
> Section 186.22, subdivision (a), reads: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years."
>
> A criminal street gang is defined in section 186.22 as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities

the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).)

A "pattern of criminal gang activity" requires "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons: [33 offenses identified]."  (§ 186.22, subd. (e).)

Defendant does not contest that the Surenos are an "ongoing organization, association, or group of three or more persons" (§ 186.22, subd. (f)) or that he is a member of the Vickystown subset of the Surenos.  He contends there is insufficient evidence that a primary activity of the Surenos is the commission of one or more of the crimes enumerated in section 186.22, subdivision (e). Defendant acknowledges that Officer Ridenour, the prosecution's gang expert, testified a primary activity of the "gang" is the commission of "[h]omicide, carjacking, robbery, drug sales, burglary, stolen autos, possession of handguns, felon in possession of weapons, [and] burglary," which are all listed crimes.  However, he argues Ridenour never clarified whether the "gang" to which he was referring was the Surenos in general or one of its subsets.

The People respond that the context of Officer Ridenour's testimony makes if [sic] "perfectly clear" he was referring to the Surenos in general.  However, as support, the People cite nothing more than the testimony indicated above.  They provide no "context" for that testimony.  Nevertheless, we have reviewed the entire trial transcript and note that, in earlier testimony, Ridenour was discussing the two primary Hispanic gangs, the Surenos and the Nortenos, and not any particular subsets.  Ridenour made no attempt to distinguish crimes committed by a particular subset from those committed by other Surenos.  Thus, there is no reason to believe he was referring to any subset of the Surenos.

Defendant next contends Officer Ridenour was never asked for the basis of his opinion that a primary activity of the Surenos was commission of the enumerated offenses.  Defendant argues an expert opinion alone does not constitute substantial evidence but must be backed by sufficient facts.

The People fail to respond to this argument.  Instead, they refer to Ridenour's testimony identifying the various offenses constituting the gang's primary activities and assert those offenses qualify under section 186.22, subdivision (e).  However, that point is not contested.  Next, the People cite Martha M.'s testimony that the criminal activity of the Playboy Surenos, to which she belonged, was "pretty crazy," in that "[e]verybody was going to jail for doing

stupid things."  Without more details, this testimony obviously had no probative value as to the primary activities of the Surenos. Finally, the People point out that defendant was an admitted member of the Vickystown Surenos and "there is little doubt that the Stockton Vickystown [S]urenos were a criminal street gang within the definition of the Penal Code."  This argument merely begs the question."

The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations.  (See Webster's Internat. Dict. (2d ed. 1942) p. 1963 [defining 'primary'].)    That definition would necessarily exclude the occasional commission of those crimes by the group's members." (People v. Sengpadychith (2001) 26 Cal.4th 316, 323.)  "Sufficient proof of the gang's primary activities might consist of evidence that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute.  Also sufficient might be expert testimony . . . ."  (Id. at p. 324.)

In In re Nathaniel C. (1991) 228 Cal.App.3d 990, the Court of Appeal found the evidence insufficient to prove a primary activity of the gang at issue - the Family - was committing crimes enumerated in section 186.22.  The gang expert in that case testified that a primary activity of the Family was to commit crimes, and enumerated the crimes he had in mind.  However, only one of those crimes qualified for the gang enhancement.  According to the court: "[T]he evidence is insufficient to show a primary activity of the Family is commission of one or more of the eight specified offenses, as required by section 186.22, subdivision (f).  This is not to say that the evidence failed to show that criminal conduct is a primary activity of the Family.  But the statute's focus is much narrower than general criminal conduct; evidence must establish that a primary activity of the gang is one or more of the listed offenses."  (Id. at p. 1004, fn. omitted.)  The court went on to explain the gang expert admitted the Family was based in an area of the state other than the expert's jurisdiction.  Thus, the expert's opinion about primary activities "did not relate specifically to the Family and its activities."  (Id. at p. 1005.)

The Court of Appeal in In re Alexander L. (2007) 149 Cal.App.4th 605 likewise found insufficient evidence that a primary activity of the gang in question was committing one or more of the enumerated crimes.   In that case, the gang expert provided the following testimony on the issue of primary activities: "'I know they've committed quite a few assaults with a deadly weapon, several assaults.  I know they've been involved in murders.  [¶]  I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.'"   (Id. at p. 611.)  However, there was no testimony regarding the basis of the expert's knowledge.  (Id. at pp. 611–612.)  On cross-examination, the expert acknowledged the vast majority of cases with which he was familiar involved graffiti.  (Id. at p. 612.)

In In re Leland D. (1990) 223 Cal.App.3d 251, the gang expert

testified the primary purpose of the gang in question was engaging in criminal activity and further indicated the gang engaged in narcotics sales, vehicle thefts and assaults. (Id. at pp. 255, 259.) The court concluded this was insufficient to establish a pattern of criminal activity. (Id. at p. 258.) There was no evidence of any specific crime committed by the gang other than a single drug offense committed by the minor. (Ibid.) Furthermore, the sources of the expert's opinion "appear to have been hearsay statements from unidentified gang members and information pertaining to arrests of purported gang members all made without a definite timeframe being established." (Id. at p. 259.)

The present matter is readily distinguishable from the foregoing cases. Officer Ridenour testified one of the primary activities of the Surenos is the commission of crimes listed in section 186.22, subdivision (e). In particular, he identified homicides, carjacking, robberies, drug sales, burglaries, stolen vehicles, possession of firearms, and being felons in possession of firearms. As the basis for his opinion, Ridenour indicated he participated in the investigation of over 500 Sureno gang crimes and has personally arrested 200 to 500 gang members. Ridenour testified that, in order to keep current on gang activities, he contacts gang members on nearly a daily basis, both in and out of custody, talks to family members and girlfriends, talks to other police officers who handle gang matters, belongs to several associations that deal with gang activities, and receives e-mails and updates throughout the week about Hispanic gangs.

Defendant argues Officer Ridenour's opinion alone is insufficient to establish the elements of the gang charge without the facts on which that opinion is based. Apparently, defendant is not satisfied with Ridenour's explanation that he has investigated over 500 Sureno gang crimes and talks with gang members, family and friends, and other officers about gang activities constantly. Defendant would presumably have Ridenour provide specific details on each of those 500 plus crimes and all of his various discussions.

In People v. Gardeley (1996) 14 Cal.4th 605 (Gardeley), the prosecution's gang expert testified that, "based on investigations of hundreds of gang-related offenses, conversations with defendants and other Family Crip members, as well as information from fellow officers and various law enforcement agencies, it was his opinion that the Family Crip gang's primary purpose was to sell narcotics, but that the gang also engaged in witness intimidation and other acts of violence to further its drug-dealing activities." (Id. at p. 612.) No further details were provided. The Supreme Court found the foregoing to be sufficient evidence to support a finding that a primary activity of the gang in question was the commission of enumerated crimes. (Id. at p. 620.)

As in Gardeley, the gang expert here was not required to provide details about all the matters he used to form his opinions about the gang's primary activities. Defendant was free to test the basis of Ridenour's information on cross-examination as the codefendant did regarding Ridenour's opinion that the instant crime benefited

1      the gang.

2      Defendant next contends there is no way to determine from
       Ridenour's testimony whether he was relying on gang offenses that
3      occurred before or after the charged offenses.  Defendant argues:
       "Both logic and fundamental principles of due process would
4      preclude the imposition of punishment for gang-related conduct
       based on proof that an organization to which the defendant
5      belonged became a criminal street gang after the commission of the
       crime of which he was convicted."  The People once again fail to
6      respond to this argument.

7      To support his argument, defendant cites Ridenour's testimony
       regarding specific crimes committed by Surenos and points out that
8      Ridenour failed to indicate when most of them occurred.  However,
       this argument goes to a different element of the gang charge -
9      whether the gang engaged in a pattern of criminal activity.
       Defendant does not raise any challenge on appeal to that element.
10     Even without the testimony regarding specific, undated crimes
       committed by gang members, Ridenour's opinion about the primary
11     activities of the gang, based on his investigation of over 500 Sureno
       gang crimes and his discussions with gang members, family and
12     friends, and other officers about gang activities, was sufficient to
       support the primary activities finding without any further specifics.
13     (See Gardeley, supra, 14 Cal.4th at p. 620.)

14

15     Mendez, 2013 WL 120935, at *11-14.

16            After a review of the record, this court concludes that petitioner is not entitled to federal

17     habeas relief on this claim of insufficient evidence.  Based on the evidence introduced at

18     petitioner's trial, it was not unreasonable for the state courts to determine that a rational trier of

19     fact could have found beyond a reasonable doubt that petitioner was an active participant in a

20     criminal street gang.  The testimony of Detective Ridenour was sufficient to demonstrate that, at

21     the time of petitioner's crimes, the primary activities of the gang with which petitioner was

22     affiliated were crimes listed in Cal. Penal Code § 186.22 (e).  The decision of the California

23     courts rejecting petitioner's claim in this regard is not contrary to or an unreasonable application

24     of the decisions in Jackson and In re Winship to the facts of this case.  This court cannot conclude

25     that "no rational trier of fact could have agreed with the jury" on this issue.  Smith, 132 S. Ct. at

26     4.  See also Coleman, 132 S. Ct. at 2062 (quoting Cavazos, 132 S. Ct. at 4).  Accordingly,

27     petitioner is not entitled to relief on this claim.

28     /////

                                            34

### D.  Ineffective Assistance of Trial Counsel

In his next ground for relief, petitioner claims that his trial counsel rendered ineffective assistance "when he elicited testimony from Detective Rodriguez falsely suggesting that Martha M. told police or testified that [petitioner] had said something about going through the victim's pockets." (ECF No. 1 at 52.)  Petitioner argues that Rodriguez's testimony provided support for the prosecution's argument that petitioner had actively assisted Cardenas in committing the robbery, and was therefore prejudicial.  (Id. at 55.)

#### 1.  State Court Decision

The California Court of Appeal denied this claim of ineffective assistance of counsel, reasoning as follows:

> During her trial testimony, Martha M. testified that, when defendant and Cardenas returned to Carina's car after the shooting, they were laughing.  She also acknowledged telling the police that, when defendant and Cardenas got into the car, they were a little jumpy as if they were in shock.  She further testified nobody said anything in the car about anyone being shot and claimed not to remember telling police otherwise.  She did not testify that defendant said anything about going through the victim's pockets before the shooting.
>
> During the defense case, counsel for defendant questioned Detective Rodriguez about his interview of Martha M. and Carina G.  Rodriguez testified that both Carina and Martha told him that when Cardenas got back in the car he said he thought he shot someone.  He further testified that they confirmed this in their preliminary hearing testimony.  Rodriguez indicated Martha did not say anything to him about hearing defendant say he went through the victim's pockets before the shot.  Counsel then continued along this line:
>
> "BY [counsel for defendant]: Q. You had a discussion with Martha [M.] in December, correct?
>
> "A. Correct.
>
> "Q. You heard her say in court that my client, [defendant], told her that he went through the victim's pockets, correct?
>
> "A. Yes.
>
> "Q. When you interviewed her in December, did she tell you the same thing?
>
> "A. No.

"Q. What did she tell you?

"A. That she had no knowledge if [defendant] had gone through the pockets.

"Q. She told you that she never heard anything in that car about [defendant] bragging about going through the guy's pockets, correct?

"A. Correct."

Defendant contends counsel's question to Detective Rodriguez about hearing Martha M. say in court she heard defendant say he went through the victim's pockets, which elicited a positive response, amounted to ineffective assistance, inasmuch as Martha did not so testify, either at trial or in the preliminary hearing. He argues there could have been no possible tactical reason for eliciting this incorrect testimony, which was then used by the prosecution in closing arguments.

The People respond that, while it is true Martha M. did not testify defendant said he went through the victim's pockets, she did testify that defendant was going to search the victim when he heard the shot. Thus, the People argue, "the fact that [defendant's] counsel attempted to discredit [Martha's] testimony that was slightly different from what she actually testified to was of no consequence."

The problem with the People's argument is that it was not Martha M., but Carina G., who testified that defendant was about to search the victim's pockets when the shot occurred. Martha M. did not testify about anything defendant said in the car. Nevertheless, as we shall explain, we find no ineffective assistance in connection with the indicated testimony.

Under both the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution, a criminal defendant has a right to the assistance of counsel. (See Strickland v. Washington (1984) 466 U.S. 668, 684–685 [80 L.Ed.2d 674, 691–692]; People v. Pope (1979) 23 Cal.3d 412, 422.) This right "entitles the defendant not to some bare assistance but rather to effective assistance." (People v. Ledesma (1987) 43 Cal.3d 171, 215.)

"To establish entitlement to relief for ineffective assistance of counsel the burden is on the defendant to show (1) trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings." (People v. Lewis (1990) 50 Cal.3d 262, 288.)

If the record does not show why counsel acted in the manner challenged, we must affirm the judgment unless there simply could

be no satisfactory explanation for counsel's conduct.  (People v. Maury (2003) 30 Cal.4th 342, 389.)

In this instance, one might readily surmise trial counsel was simply confused as to who had testified about defendant saying he was about to go through the victim's pockets.  Counsel was asking Detective Rodriguez about statements made by both Martha M. and Carina G., including their respective testimony.  Rodriguez too apparently confused the two women.  An honest mistake does not necessarily amount to ineffective assistance.  A criminal defendant is entitled to effective assistance, not perfect assistance.  (United States v. Cronic (1984) 466 U.S. 648, 656–658 [80 L.Ed.2d 657, 666–667]; People v. Wallin (1981) 124 Cal.App.3d 479, 484–485; People v. Hartridge (1955) 134 Cal.App.2d 659, 666–667.)  The question is whether counsel's conduct met the standard of a reasonably competent attorney.

At any rate, in light of Carina's testimony about defendant preparing to go through the victim's pockets before the shooting, any error in attributing that testimony to Martha was clearly harmless.  And whether defendant said he went through the victim's pockets or was about to do so is of no moment.  Either way, it demonstrates defendant was an active participant in the attempted robbery.

Defendant argues he was prejudiced because the prosecutor relied on the erroneous testimony during argument to the jury.  However, the prosecution's argument could as easily have been a reference to Carina's testimony rather than Martha's.  Because defendant has failed to demonstrate any prejudice from the erroneous testimony, his ineffective assistance claim is rejected.

Mendez, 2013 WL 120935, at *6-8.

## 2.  Applicable Legal Standards

The clearly established federal law governing ineffective assistance of counsel claims is that set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).  To succeed on a Strickland claim, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense."  Id. at 687.  Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases."  Id. at 687–88 (internal quotation marks omitted).  "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'"  Richter, 562 at 104 (quoting Strickland, 466 U.S. at 687).

1     Prejudice is found where "there is a reasonable probability that, but for counsel's

2  unprofessional errors, the result of the proceeding would have been different." Strickland, 466

3  U.S. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the

4  outcome." Id.  "The likelihood of a different result must be substantial, not just conceivable."

5  Richter, 131 S. Ct. at 792.

6     "The standards created by Strickland and § 2254(d) are both "highly deferential," and

7  when the two apply in tandem, review is 'doubly' so." Richter, 562 U.S. at 105 (citations

8  omitted).  Thus, in federal habeas proceedings involving "claims of ineffective assistance of

9  counsel, . . . AEDPA review must be """doubly deferential""" in order to afford "both the state

10  court and the defense attorney the benefit of the doubt." Woods v. Daniel, 135 S. Ct. 1372, 1376

11  (2015) (quoting Burt v. Titlow, 571 U.S. 134 S. Ct. 10, 13 (2013)).  As the Ninth Circuit has

12  recently acknowledged, "[t]he question is whether there is any reasonable argument that counsel

13  satisfied Strickland's deferential standard." Bemore v. Chappell, 788 F.3d 1151, 1162 (9th Cir.

14  2015) (quoting Richter, 562 U.S. at 105).  See also Griffin v. Harrington, 727 F.3d 940, 945 (9th

15  Cir. 2013) ("The pivotal question is whether the state court's application of the Strickland

16  standard was unreasonable.  This is different from asking whether defense counsel's performance

17  fell below Strickland's standard.") (quoting Richter, 562 U.S. at 101).

18          **3. Analysis**

19     As set forth above, the California Court of Appeal concluded that even if trial counsel was

20  deficient in eliciting from Detective Rodriguez that Martha M. stated petitioner went through the

21  victim's pockets, petitioner had failed to show prejudice.  This court agrees.  Carina G. testified

22  that after petitioner got in the car he told her that he was "going to search" the victim when he

23  heard the gunshot.  (RT at 1320-22.)  The fact that petitioner's trial counsel asked Detective

24  Rodriguez about substantially the same testimony, but mistakenly attributed it to Martha M.

25  instead of to Carina G., could not have had a significant impact on the verdict.  Put another way,

26  there is no reasonable probability the result of the proceedings would have been different if trial

27  counsel had correctly attributed the testimony about searching the victim, or searching his

28  pockets, to Carina G.  Because petitioner has failed to show prejudice, he is not entitled to relief

1  on this claim of ineffective assistance of counsel.

2  **E.  Jury Instruction Error**

3  In his final claim for relief, petitioner argues that the trial court violated his right to due

4  process in mis-instructing the jury on the elements of the vicarious gun use enhancements.  (ECF

5  No. 1 at 72.)

6  **1.  State Court Decision**

7  The California Court of Appeal described petitioner's arguments, and its ruling thereon, as

8  follows:

9  Section 12022.53 provides for an enhancement in the event a
10  designated offense, including murder (§ 12022.53, subd. (a)(1)), is
   committed with the use of a firearm.  If the defendant personally
11  used a firearm in the commission of the offense, the enhancement is
   10 years.  (§ 12022.53, subd. (b).)  If the defendant personally and
12  intentionally discharged a firearm, the enhancement is 20 years.  (§
   12022.53, subd. (c).)  If the defendant personally and intentionally
13  discharged a firearm and caused great bodily injury or death, the
   enhancement is an indeterminate term of 25 years to life.   (§
14  12022.53, subd. (d).)  Finally, if the offense was committed for the
   benefit of a criminal street gang within the meaning of section
15  186.22, subdivision (b), any principal in the offense is subject to the
   same enhancement as the person who used or discharged the
16  firearm.  (§ 12022.53, subd. (e).)

17  The trial court instructed the jury on the gun use enhancement
   pursuant to CALCRIM No. 1402 as follows: "[I]f you find the
18  defendant guilty of either of the crimes charged in Counts 1 and 2,
   murder or attempted robbery, and you find that the defendant
   committed those crimes for the benefit of, at the direction of, or in
19  association with a criminal street gang with the intent to promote,
   further, or assist in any criminal conduct by gang members, you
20  must then also decide whether, for each crime, the People have
   proved the additional allegation that one of the principals in the
21  crime personally used or personally and intentionally discharged a
   firearm during the commission of that crime, which caused Mr.
22  Montejo's death.  You must decide whether the People have proved
   this allegation for each crime and return a separate finding for each
23  crime.

24  "To prove this allegation, the People have to prove that:

25  "1. *Someone who was a principal in the crime personally used or*
   *discharged a firearm during the commission or attempted*
26  *commission of the robbery*; and

27  "2. That person intended to discharge the firearm; and

28  "3. That person's act caused the death of another person who was

39

not an accomplice to the crime.

"A person is a principal in a crime if he directly commits or attempts to commit the crime, or if he aids and abets someone else who committed the crime or attempted to commit the crime.

*"A principal personally uses a firearm if he intentionally does any of the following:*

"1. *Displays the firearm in a menacing manner*;

"2. *Hits somebody with it*; or

"3. *Fires the firearm.*

"An act causes death if the death is the direct, natural and probable consequence of the act and the death would not have happened without it.   A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.   In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence." (Italics added.)

Defendant contends that, by virtue of the italicized portions of the foregoing instruction, the jury was free to find this firearm enhancement true based on a finding merely that Cardenas "used" the firearm by displaying it in a menacing manner.   Defendant asserts that, on the evidence presented, the jury could have determined the discharge of the firearm was accidental, whereas the enhancement requires an intentional discharge.   The jury could have concluded Cardenas displayed the firearm to the victim in a menacing manner, i.e., used it, in an attempt to get the victim to give up his property.   However, such menacing display would be insufficient to support a life term under section 12022.53, subdivisions (d) and (e).

The People contend the instruction was correct because it required the jury to find Cardenas intentionally discharged the firearm. However, in making this argument, the People completely ignore the italicized portions of the instruction, which clearly gave the jury a choice between finding an intentional discharge of the firearm or a use of it, where such use was defined to include displaying in a menacing manner.

In the original CALCRIM version of the instruction, the first italicized portion above reads: "[1.] Someone who was a principal in the crime personally (used/discharged) a firearm during the commission   [or   attempted   commission]   of   the _____<insert appropriate crime listed in Penal Code section 12022.53(a)   (./;)"   (CALCRIM No. 1402.)   The Bench Note to the instruction states: "In this instruction, the court must select the appropriate options based on whether the prosecution alleges that the principal used the firearm, intentionally discharged the firearm, and/or intentionally discharged the firearm causing great bodily injury or death."   (Bench Note to CALCRIM No. 1402,

p. 1169.)  The note also directs that the second italicized portion of the instruction given by the court, which concerns "use" of the firearm, should be given "only if the prosecution specifically alleges that the principal 'personally used' the firearm." (*Ibid.*)  It further instructs not to give that portion "if the prosecution alleges intentional discharge or intentional discharge causing great bodily injury or death." (Ibid. )

The information here charged that, in the commission of the crimes, "a principal intentionally and personally discharged a firearm" and "proximately caused great bodily injury . . . or death . . . ."  The verdict forms were likewise limited to discharge of the firearm. Thus, under the use notes, the trial court should not have included in the instruction the language relating to use of a firearm.

However, the instructional error was harmless in this instance.  The evidence here showed it was the discharge of the firearm into the victim's chest that caused his death.  In addition to instructing the jury that it must find a principal either used or discharged a firearm, the jury was told it must find a principal "intended to discharge the firearm" and the principal's "act caused the death of another person who was not an accomplice to the crime."  Thus, in order to find the charge true, the jury had to conclude both that a principal intended to discharge the firearm and that such act, i.e., the discharge, caused the death of the victim.  An intentional use of the firearm by displaying it in a menacing manner did not cause the death of the victim.  In order to find the charge true, it would not be enough for the jury to conclude a principal displayed the firearm in a menacing manner and it went off accidentally.  The jury was also required to find the principal intended to discharge the firearm.

"It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction."  (People v. Burgener (1986) 41 Cal.3d 505, 538–539.)  Absent a contrary indication in the record, we assume the jury followed the instructions as given by the court.  (People v. Adcox (1988) 47 Cal.3d 207, 253.)

Mendez, 2013 WL 120935, at *16-18.

## 2.  Applicable Legal Standards

In general, a challenge to jury instructions does not state a federal constitutional claim. Engle v. Isaac, 456 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due process right guaranteed by the fourteenth amendment."  Cupp v. Naughten, 414 U.S. 141, 146 (1973). The appropriate inquiry "is whether the ailing instruction . . . so infected the entire trial that the

1  resulting conviction violates due process." Middleton v. McNeil, 541 U.S. 433, 437 (2004)

2  (quoting Estelle v. McGuire, 502 U.S. 62, 72 (1991)).

3      "[A] single instruction to a jury may not be judged in artificial isolation, but must be

4  viewed in the context of the overall charge." Id. (quoting Boyde v. California, 494 U.S. 370, 378

5  (1990)) (internal quotation marks omitted). "Instructions that contain errors of state law may not

6  form the basis for federal habeas relief." Gilmore v. Taylor, 508 U.S. 333, 342 (1993). "If the

7  charge as a whole is ambiguous, the question is whether there is a 'reasonable likelihood that the

8  jury has applied the challenged instruction in a way' that violates the Constitution." Dixon v.

9  Williams, 750 F.3d 1027, 1033 (9th Cir. 2014), as amended on denial of reh'g and reh'g en banc

10  (June 11, 2014) (citations omitted).

11      Petitioner is entitled to relief on this jury instruction claim only if he can show prejudice.

12  Dixon, 750 F.3d at 1034. Prejudice is shown for purposes of habeas relief if the trial error had a

13  "substantial and injurious effect or influence in determining the jury's verdict." Brecht v.

14  Abrahamson, 507 U.S. 619, 637 (1993). A reviewing court may grant habeas relief only if it is

15  "'in grave doubt as to the harmlessness of an error.'" Id. (quoting O'Neal v. McAninch, 513 U.S.

16  432, 437 (1995)).

17      **3. Analysis**

18      As set forth above, the California Court of Appeal concluded that the jury instruction error

19  that occurred in this case was harmless because the jury instructions as a whole would not allow

20  the jury to convict petitioner of the sentence enhancement for personal use of a firearm unless the

21  firearm was actually discharged and caused the victim's death. This court agrees. As the

22  California Court of Appeal explained, even if some of the language of the instruction was

23  ambiguous, the instructions as a whole clarified the requirements for a true finding on the

24  sentence enhancement.

25      This court rejects petitioner's argument that "the jury based its true finding on the

26  vicarious firearm enhancement on a finding that Cardenas had intentionally displayed the weapon

27  in a menacing manner, and it had accidentally discharged; rather than on a finding that he

28  intentionally fired the gun." (ECF No. 1 at 77.) The jury instruction required that in order to

1  find the sentence enhancement true, the jurors had to find that a principal "intended to discharge

2  the firearm."  This language would preclude a true finding if the jury found the weapon was

3  discharged accidentally.

4       For the foregoing reasons, the decision of the California Court of Appeal that the jury

5  instruction error was harmless is not contrary to or an unreasonable application of clearly

6  established federal law.  Accordingly, petitioner is not entitled to relief on this jury instruction

7  claim.

8  **IV. Conclusion**

9       IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas

10  corpus be denied.

11       These findings and recommendations are submitted to the United States District Judge

12  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

13  after being served with these findings and recommendations, any party may file written

14  objections with the court and serve a copy on all parties.  Such a document should be captioned

15  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

16  shall be served and filed within fourteen days after service of the objections.  Failure to file

17  objections within the specified time may waive the right to appeal the District Court's order.

18  <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir.

19  1991).  In his objections petitioner may address whether a certificate of appealability should issue

20  in the event he files an appeal of the judgment in this case.  <u>See</u> Rule 11, Federal Rules Governing

21  Section 2254 Cases (the district court must issue or deny a certificate of appealability when it

22  enters a final order adverse to the applicant).

23  Dated:  May 11, 2016

24

25  KENDALL J. NEWMAN
    UNITED STATES MAGISTRATE JUDGE

26

27  Dmou8(2);Mendez1950.hc (du)

28

43